**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**MIAMI DIVISION**

**CASE NO. 1:15-cv-22825-KMM**

**SURAL (BARBADOS) LTD.**

   **Petitioner,**

**vs.**

**THE GOVERNMENT OF THE REPUBLIC OF**
**TRINIDAD AND TOBAGO THROUGH ITS**
**MINISTER OF FINANCE AS CORPORATION**
**SOLE,**

   **Respondent.**

_____/

**PETITIONER'S MOTION TO SET ASIDE, IN PART, THE ARBITRATION AWARD**
**AND INCORPORATED MEMORANDUM OF LAW**
**(Corrected Copy)**

   Petitioner Sural (Barbados) Ltd. respectfully moves this Court to vacate an arbitral award rendered against it and in favor of Respondent, the Government of The Republic of Trinidad and Tobago, on the grounds set forth herein.

**PRELIMINARY STATEMENT**

   1. The arbitral award at issue arose from a Miami arbitration brought under the supervision of the International Court of Arbitration of the International Chamber of Commerce (the "ICC"). Petitioner Sural (Barbados) Ltd. ("Sural") claimed its rights were violated under a contract it had with Respondent, the Government of The Republic of Trinidad and Tobago (the "Government"), to develop an aluminum industry in Trinidad. The Government failed to buy out Sural's interests in the aluminum project and then later cancelled the project, both in violation of the contract and a subsequent written modification of that contract.

   2. During the course of the proceedings, the arbitrators denied Sural access to important evidence, evidence that may well have been dispositive concerning Sural's breach of contract claims. Simultaneously, the arbitrators granted the Government access to similar documents. The arbitrators then refused Sural's request to issue a subpoena for the testimony of a

third party witness who had knowledge of the critical events reflected in those documents.  By doing so, the tribunal breached its duty under governing Florida law to treat the parties equally and to give each party a full opportunity to present its case.  Florida Statutes §§ 684.0029, 684.0046(2)(a)(2) (2015).  Sural moves this Court to set aside the underlying Award for breach of these fundamental rules of fairness and justice.

## THE PARTIES

3.     The Sural Group of Companies ("Sural Group") was founded in 1978 and is headquartered in Venezuela. (Award ¶ 47).[1]  Sural Group members manufacture and market aluminum products like aluminum alloy, rods, cables and wires, and automobile wheels. (Award ¶ 47).  The Sural Group is owned and operated by Alfredo Riviere and his family. (Award ¶ 47). The petitioner in this case, Sural (Barbados) Ltd. ("Sural"), is part of the Sural Group. (Award ¶¶ 47-48).

4.     The respondent is the Government of the Republic of Trinidad and Tobago ("Government") (Award ¶ 3).  The Government signed the parties' Shareholders' Agreement through its Minister of Finance[2] acting as corporation sole. (Award ¶ 49).

## JURISDICTION

5.     This Court has jurisdiction over the Government under 28 U.S.C. §§ 1330(a) and 1602 *et seq*. ("Foreign Sovereign Immunities Act").  *See GDG Acquisitions, LLC v. Government of Belize*, 749 F. 3d 1024, 1028 (11th Cir. 2014).  The Government is a foreign state under 28 U.S.C. § 1603(a).  *Id.*

6.     This court also has subject matter jurisdiction under the New York Convention, 9 U.S.C. § 201 *et seq*., because the Award is non-domestic within the meaning of the Convention. *See Jain v. de Mere*, 51 F. 3d 686, 689 (7th Cir 1995); *Industrial Risk Insurers v. M.A.N.*

---

[1] All references to the Arbitration Award will be in the format "(Award ¶ XX)."  The Award is attached as Exhibit A to the Petition/Application to Set Aside, in Part, and to Confirm, in Part, the Arbitration Award and Motion for Extension of Time to File Formal Motion and Memorandum of Law (the "Petition") filed on July 29, 1015 [D.E. 1]. All references to the exhibits attached hereto will be in the format "(Exhibit XX)."

[2] There are several departments and ministries of the Trinidad and Tobago Government that were discussed in the underlying arbitration, but those departments and ministries have no relevance to the issues raised in this Motion.  As such, Sural generically refers to all Government departments and ministries as simply the "Government" in this Motion unless the specific department or ministry has relevance to the issues before the Court.

*Gutehoffnungshuette GmbH*, 141 F. 3d 1434, 1440-41 (11th Cir 1998); *Yusuf Ahmed Alghanim & Sons, W.L.L. v Toys "R" Us, Inc.*, 126 F. 3d 15 (2nd Cir 1997).

7.      Venue is proper in this district because Miami was the place of arbitration as agreed to by the parties. (Award ¶ 206).  *See also* Florida Statutes §§ 684.0008 and 684.0046(2) (2015).

## FACTUAL BACKGROUND

### I.      History of the Aluminum Project

8.      Trinidad and Tobago ("Trinidad") has extensive natural gas and oil resources. (Award ¶ 51).  For many years, Trinidad's economic strategy was to transition from being a commodity supplier of oil and gas in international markets to using its natural gas resources to develop a more diverse economy producing higher-value products. (Award ¶ 51). Aluminum smelting and production was an appealing business for Trinidad because the aluminum manufacturing process requires large amounts of electricity that can be inexpensively produced in Trinidad using its natural gas as feedstock. (Award ¶ 51).

9.      Sural's Riviere began initial discussions regarding the development of a smelter in Trinidad in 2001 with representatives of then Trinidadian Prime Minister Basdeo Panday. (Award ¶ 54).  Kenneth Julien, head of the Government's Natural Gas Export Task Force, was a key part of the discussions. (Award ¶ 54).  For several years, the parties discussed a project with two phases: (a) phase one would be a 125,000 metric tons per year ("mtpy") smelter to produce aluminum to fabricate aluminum rods, cable and wires, auto parts and other cast products; and (b) phase two would increase the smelter's capacity to 250,000 mtpy. (Award ¶ 56).

10.      On February 10, 2005, a Memorandum of Understanding was signed between the Sural Group and the Government establishing the framework for advancing the project. (Award ¶¶ 58-59).  Soon after on March 23, 2005, a Memorandum of Understanding was signed between the Government, the Sural Group, and China National Machinery & Equipment Import and Export Corporation ("CMEC") for CMEC to be the Engineering, Procurement, and Construction ("EPC") contractor for the project. (Award ¶¶ 62-63).  The financing for the smelter would be partly financed by equity contributions from the project owners (i.e. the Government and Sural) and 70% from loans from the Exim Bank of China. (Award ¶ 65).  Riviere negotiated with CMEC for it to design and construct a plant at the price of approximately $2,250 per metric ton. (Award ¶ 66).  This plant would include a bar, rod, wire and cable facility using

Sural's technology. (Award ¶ 66).  The project was called "integrated" because it included both upstream (the smelter) and downstream (the bar, rod, wire and cable facility) portions into one project. (Award ¶ 66).

11.     On April 8, 2005, Alutrint Limited was incorporated in Trinidad under the name Trinalco Limited. (Award ¶¶ 68-69).  On June 1, 2005, Trinalco Limited's name was changed to Alutrint. (Award ¶¶ 68-69).  Alutrint was the corporate vehicle to develop the project to be owned 60% by the Government and 40% by Sural. (Exhibit C to D.E. 1).

12.     On May 18, 2005, a Letter of Agreement was signed between the Government and the Sural Group. (Award ¶ 70).  The letter set forth key parameters for how Alutrint would be operated pending the parties' execution of a more formal document. (Award ¶ 70). That Letter of Agreement was superseded by the Shareholders' Agreement when it was signed on July 3, 2007. (Award ¶ 70).

13.     On December 23, 2005, the Government applied for an environmental permit for the development, construction, and operation of a 125,000 mtpy smelter and related Sural rod, and wire and cable downstream facilities. (Award ¶ 74).  On March 15, 2007 the Government's Cabinet sanctioned the project at an estimated cost of $552 million. (Award ¶ 82).  On April 2, 2007, the environmental permit was issued subject to conditions relating to operations. (Award ¶ 83).

**II.     The Shareholders' Agreement**

14.     Sural and the Government executed the Shareholders' Agreement on July 3, 2007. (Award ¶ 87; Exhibit C to D.E. 1).  But on September 12, 2007, a Trinidadian court granted public objectors leave to appeal the environmental permit. (Award ¶ 93).

15.     Shortly before the Shareholders' Agreement was signed, Alutrint agreed to pay $20 million to CMEC (the project's contractor) for mobilization expenses that contemplated the commencement of construction after the awarding of the permit and the signing of the Shareholders' Agreement. (Award ¶¶ 84-85).  Alutrint's board requested that the shareholders pay that sum to Alutrint, 60% by the Government and 40% by Sural. (Award ¶ 85).  Sural did not make the payment because of the imposition of new currency restrictions in Venezuela and, as emerged over the next several months, the legal challenge to the environmental permit, and the eruption of the project budget. (Award ¶ 96-99).  The Government served on Sural a notice of material breach in December 2007 for failing to make the payment. (Award ¶ 94).

16.     Sural's presence in the downstream, value-added part of the project was a key part of the project for the Government.[3] (Exhibit 1).  In response to the notice of breach, Sural made two restructuring proposals in late 2007 and early 2008. (Award ¶¶ 96-97, 102-05).  The first contemplated that Sural would withdraw from the "upstream" smelter but remain involved in a separately financed downstream. (Award ¶¶ 96-97).  Shortly thereafter, Sural made a second restructuring proposal in which it proposed doubling the size of the smelter and to bring a new partner into the project. (Award ¶¶ 102-05).

17.     Thus, in the first and second quarters of 2008, Riviere contacted Brazilian industrial conglomerate the Votorantim Group ("Votorantim") to join the project. (Award ¶ 106).  Sural introduced Votorantim to government officials in Trinidad, and Votorantim agreed to become Sural's partner in the restructured project. (Award ¶ 107).  Votorantim executive Marco Palmieri led the discussions on Votorantim's behalf. (Award ¶ 108).

18.     The Government decided to pursue the second proposal (i.e. doubling the size of the smelter and to bring a new partner into the project). (Award ¶ 109).  Sural and Votorantim agreed that Votorantim would joint-venture in the project with Sural and Votorantim agreed to buy Sural's interest for $100 million plus a return of Sural's equity contributions (approximately $6 million) subject to the achievement of certain project milestones. (Award ¶ 113).  Votorantim and Sural submitted a proposal to the Government outlining a revised and expanded project. (Award ¶ 111).

19.     The financial crisis interfered and as it worsened, on November 5, 2008, Votorantim's Palmieri wrote to Riviere proposing to reduce the Votorantim joint venture payment obligation to Sural from $100 million to $60 million (plus a return of Sural's equity contributions). (Award ¶ 118; Exhibit 2).  This offer was not accepted.  And then on May 29, 2009, Votorantim again wrote to Sural seeking to lower its payment commitment to $15 million, stating that the prior agreement was moot "due to severe economic changes." (Award ¶ 122).  Sural did not accept. (Award ¶ 122).

20.     During the time that Votorantim twice attempted to lower its joint venture payment commitment to Sural, Sural continued to assert its rights in the smelter portion of the project.

---

[3] According to the testimony of Kenneth Julien, head of the Government's Natural Gas Export Task Force: "[I]f we did not have a downstream, if we did not have a Sural, there would be no project."

(Award ¶ 115).  For example in February 2009, Sural wrote the Government to reiterate that it had not and would not renounce its interest in the smelter. (Award ¶ 119).

21.     For its part, the Government was treading carefully.  During a Government Cabinet meeting on March 12, 2009, the Cabinet decided to proceed forward with Votorantim alone, to terminate the Shareholders' Agreement with Sural, and to negotiate to buy Sural's interest in Alutrint.[4] (Award ¶ 120).  And on March 25, 2009, the Government wrote Palmieri stating that Votorantim had been selected as the Government partner for the Alutrint project, but "without prejudice to possible future participation by Sural in the development of the Aluminum Industry in Trinidad and Tobago." (Award ¶ 121).

## III.    Offer and Acceptance for Buyout

22.     The stage was now set for the key negotiations for the Government's buyout of Sural's interest.  On September 9, 2009, Sural wrote a letter to the Government. (Award ¶¶ 123, 124).  It stated:

> After the world financial crisis, the original proposal presented by Votorantim and Sural was left aside and Votorantim entered into direct conversations with GORTT.  As a consequence of these conversations the original proposal will be modified, but Sural wants to strongly express that it continues to be, fully committed to the full realization of the aluminum development in Trinidad and Tobago.  Sural is prepared to work with GORTT and Votorantim to facilitate the development, construction and operation of the Alutrint Aluminum Complex.   In addition, Sural continues committed to the project and would dedicate available funds to Alutech for the construction and operation of the downstream alloy-rod mill, wire and cable plants and the Development Center for which it currently owns state of the art technology and equipment.   As discussed previously, this facility would provide a significant economic impact.
>
> To take these 2 ideas forward, Sural wishes to propose the following:
> 1. According to the unanimous shareholder agreement article 14.1, Sural offers the sale of 40% of its share participation in Alutrint thus providing GORTT with 100% ownership of the smelter complex.
> 2.   GORTT will proceed with Votorantim for the development, construction and operation of the Alutrint Aluminum Complex.
> 3. GORTT would detail an agreement with Sural in Alutech for the construction and operation of downstream alloy-rod mill, wire and cable plants and the Development Center.

---

[4] Despite this, the Government's testimony is that Sural was never terminated. (Exhibit 19).

> 4.  To assure the viability of its downstream investment (item 3, above) Sural would like to have an option to re-enter the smelter project should Votorantim not proceed with future investments in the Alutrint capital base.  In the event Votorantim does not acquire additional equity capital beyond its initial 10% and/or were to express a desire to reduce its ownership in the Alutrint Aluminum Complex, GORTT shall give an option to Sural to substitute Votorantim in the Alutrint structure and would also give Sural similar rights as agreed with Votorantim.

(Award ¶ 124) (emphasis added).

23.     In response, the Government's Minister of Energy on October 2, 2009 wrote:

> As regards the specific points raised in your letter, the Government accepts your offer for the sale of 40% of the share participation in Alutrint Limited.  On the question of whether Sural had complied with the Alutrint equity call made on July 04, 2007 for the sum of US $20 million and whether that call was met by the joint proposal from Votorantim and Sural is a matter which will be addressed by Minister of Finance.
>
> With respect to items three and four in your letter, I am requesting the Natural Gas Export Task Force to meet with Sural to discuss these proposals.
>
> Notwithstanding the above and in order to expedite the process I would like to suggest that you make an offer to the Minister of Finance for the sale of Sural's share participation in Alutrint Limited.

(Award ¶ 125) (emphasis added).

24.     As a follow up, Sural sent a letter to the Government on October 26, 2009 advising that it would discuss the matter with the Minister of Finance according to article 4.1[5] of the Shareholders' Agreement. (Award ¶ 127; Exhibit 3).

## IV.     Agreement between the Government and Votorantim

25.     On December 4, 2009, the Government and Votorantim signed a formal agreement for Votorantim's participation in Alutrint. (Award ¶ 128).  The agreement required Votorantim to make initial contributions totaling $30 million ($15 million during 2009 and $15 million during 2010).[6] (Award ¶ 128; Exhibit 4).  Thereafter, Votorantim was given

---

[5] The reference to article 4.1 was clearly a typo and 14.1 was intended.  Article 4.1 of the Shareholders' Agreement is irrelevant to these issues as it concerns Undertakings of the Company and Shareholders.

[6] The agreement called for Votorantim to receive a 10% interest in the 250,000 mtpy smelter and downstream facilities as to which only $3.12 million of the initial $15 million was to be allocated to Votorantim's purchase of Alutrint equity.

#36927248_v12

options to acquire more shares in Alutrint. (Award ¶ 128; Exhibit 4). While the agreement was effective immediately, a condition to Votorantim's duty to perform was that Sural's equity participation in Alutrint be terminated. (Award ¶ 129; Exhibit 4).

26.   The conditions precedent clause at paragraph 2 of the agreement provided:

> (Clause 2(a) (iii)): "Termination of Sural Participation. Sural shall no longer be a shareholder of Alutrint and shall have no further involvement or participation in Alutrint or the Project. GORTT shall deliver to Votorantim documentary evidence, in form and substance satisfactory to Votorantim and GORTT, as to the full termination of Sural's involvement in the Project and in Alutrint for so long as Votorantim maintains an equity investment in Alutrint. Such termination shall be without prejudice to the possible future involvement of Sural in the development of the aluminum industry in Trinidad and Tobago, it being understood that Votorantim shall have no obligation to guarantee or to promote Sural's future involvement".

(Award ¶ 131). And the agreement later stated:

> Any claims arising from the period prior to the signature by Votorantim of definitive documentation relating to the Project will be GORTT's sole responsibility and obligation, and GORTT shall indemnify and hold Votorantim harmless with regard to any such claims.[]

(Award ¶ 131).

## V.   The Government Cancels the Aluminum Project

27.   On March 4, 2010, the Government recounted in cabinet minutes how Sural – clearly in reference to the September 9, 2009 letter – offered for sale its participating interest in Alutrint. (Award ¶ 132; Exhibit 5). The minutes stated that the Minister of Energy, on behalf of the Government, had accepted the offer. (Award ¶ 132; Exhibit 5).

28.   And on April 21, 2010, Sural wrote to the Government again confirming that it agreed to sell its 40% stake in Alutrint for its fair market value. (Award ¶ 134).

29.   On May 27, 2010, Trinidad's governing party was defeated in the general election. (Award ¶ 135). Within months, the newly elected Government decided to abandon several projects including the Alutrint smelter and its related downstream business. (Award ¶ 136).

30.   After the new Government's announcement that it was cancelling the project, negotiations continued between the Government and Sural concerning the Government

buyout of Sural's interests, but the talks were not successful. (Award ¶¶ 140-152). This arbitration followed.

## PROCEDURAL HISTORY OF THE ARBITRATION

### I.  Initial Pleadings

31.    On July 2, 2012, Sural submitted its Request for Arbitration (the "Request") with the International Court of Arbitration of the International Chamber of Commerce (the "ICC"). (Award ¶ 10).  The Government first filed jurisdictional objections with the ICC. (Award ¶ 11). The ICC remanded all jurisdictional issues to the arbitrators for resolution. (Award ¶ 15).  The parties met with the arbitrators where the arbitrators issued Terms of Reference and deferred ruling on the jurisdictional objections until after final hearing. (Award ¶ 17).

32.    Under an English procedure, the Government moved on January 17, 2014 to require Sural to post a bond as security for its anticipated arbitral costs and legal fees should it prevail. (Award ¶ 22).  Substantial briefing ensued. (Award ¶ 22).  On June 3, 2014, the arbitrators issued a finding that Miami was the arbitral seat of the arbitration and denied the Government's motion. (Exhibit "A" to Petition/Application; Award ¶ 23)).  The proceedings then went into the discovery phase.

### II.  Discovery

33.    Each party made requests for the production of documents. (Award ¶ 21).  The requests were ruled on by the Tribunal on November 27, 2013, February 7, 2014, May 5, 2014, and July 23, 2014. (Award ¶ 21).  Specifically on November 27, 2013, the Tribunal sustained the Government's objection without prejudice wherein the Government objected to Sural's request for communications between the Government and Votorantim. (Exhibit 6).  On February 11, 2014, Sural emailed the Government reiterating that Sural still sought communications between the Government and Votorantim and also proposed search terms for the parties to use. (Exhibit 7). The following day, the Government responded and, *inter alia*, again refused to produce documents between it and Votorantim. (Exhibit 8).

34.    The Government, in turn, sought access to Sural's communications with Votorantim.  And on October 15, 2013, the Government served three disclosure requests for production of documents on Sural. (Exhibit 9).  The third request was for communications between Votorantim and Sural following the submission of the joint Sural and Votorantim proposal of June 7, 2008. (Exhibit 10).  Sural responded to the disclosure requests and agreed it would produce its

9

communications with Votorantim. (Exhibit 11).   Significant correspondence was exchanged between the parties and the Tribunal wherein the Government complained about – and Sural defended – Sural's document production protocols. (Exhibit 12).

35.     On February 7, 2014, the Tribunal ruled that Sural produce the communications between it and Votorantim within 21 days. (Exhibit 13).   Sural thereafter produced to the Government all documents responsive to the Government's requests. (Exhibit 14).

36.     On June 19, 2014, Sural again submitted a motion to compel the production of *inter alia*: the correspondence and communications between the Government and Votorantim from June 2008 through 2009 considering or otherwise relating to the Government's legal right or duty to purchase Sural's interest in the aluminum project at the formula price set forth in Shareholders' Agreement. (Exhibit 15).   On July 23, 2014, the Tribunal again denied this request for the Votorantim documents. (Exhibit 16).

37.     On July 16, 2014, Sural submitted a Motion to Issue Subpoena for Final Hearing Testimony of Marco Palmieri. (Exhibit 17).   Sural's motion stated that: (a) a key part of Sural's case concerned the introduction, agreements, communications, and overall business dealings between Votorantim and the Government; (b) Palmieri was the point person at Votorantim concerning all the issues regarding the aluminum project; and (c) Palmieri left Votorantim and was then employed as Senior Vice President of Novelis in Atlanta and was therefore within the subpoena power of the Tribunal. (Exhibit 17).

38.     On July 29, 2014, the Tribunal rejected Sural's request for a subpoena. (Award ¶ 24).   It ruled: "The Tribunal has considered the claimant's application for the Tribunal to issue a subpoena requiring Mr. Palmieri to give evidence, probably in Atlanta, Georgia.  The Tribunal rejects the application: the application is made very late and taking of the evidence may be disruptive of the course of the arbitration and unfair to the respondent: and the tribunal is not satisfied that the evidence would be necessary or material." (Award ¶ 24).

III.     **Final Submissions, Final Hearing, and Award**

39.     The parties thereafter submitted witness statements and expert reports. (Award ¶¶ 25-31).   Pre-Hearing Briefs were filed on August 13, 2014. (Award ¶ 32).  On September 8-10, 2014, the final hearings were held in Miami, Florida. (Award ¶¶ 33-38).

40.     The parties submitted Post-Hearing Briefs on October 3, 2014. (Award ¶ 39).

41.     The Award was issued on June 12, 2015 and received by Sural on June 15, 2015. The Award is attached as Exhibit "A" to the Petition/Application [D.E. 1].

**MEMORANDUM OF LAW**

## I.     Facts

42.     Sural advanced two primary arguments in the arbitration.  First, Sural argued that the exchange of letters in September and October 2009 between Sural and the Government "varied" (the English term for "modified" in this context)[7] the Shareholders' Agreement to create a binding and enforceable obligation for the Government to buy – and for Sural to sell – Sural's interest in Alutrint under the formula set forth in section 14.1 of the Shareholders' Agreement. (Award ¶¶ 208-210).  In the alternative, Sural argued that even absent a finding that a modification of the Shareholders' Agreement happened, Sural and the Government kept the Shareholders' Agreement alive by recognizing its continued effectiveness through the 2010 Trinidad elections. (Award ¶ 227).  As such, the Government waived the materiality of Sural's alleged breach of the 2007 capital call, and the Government materially breached and repudiated the Shareholders' Agreement by cancelling the project after the 2010 Government elections. (Award ¶¶ 207, 257). In the Award, the arbitrators ruled against Sural on both points. (Award ¶¶ 226, 265).  But the Tribunal's earlier discovery rulings meant that the Award did not take into account critical evidence concerning the dealings between the Government and Votorantim. (Award ¶¶ 21, 24). These discovery rulings resulted in the parties being treated unequally.

43.     First, the Tribunal ordered Sural to produce its communications with Votorantim. (Exhibit 13).  But when Sural sought from the Government communications between the Government and Votorantim, Sural's requests were denied. (Exhibit 16).  Second, Sural requested issuance of a subpoena for Votorantim's Palmieri. (Award ¶ 24).  Palmieri was the only known witness within the subpoena power of the Tribunal who could testify concerning the dealings between Votorantim and the Government. (Exhibit 17).  The Tribunal refused Sural's request. (Award ¶ 24).

44.     The documentation and testimony that Sural sought was important for the following reasons:

---

[7] The Shareholders' Agreement states that the governing law is the law of Trinidad. (Award ¶ 8).  However the parties operated throughout the arbitration with the understanding that Trinidadian law is the same as English law, and that English law was the substantive law of the case.

a.  In September and October 2009, Sural and the Government exchanged letters wherein Sural offered to sell its interest in the project – and the Government agreed to buy that interest – under the purchase and sale mechanism and pricing formula found at section 14.1 of the Shareholders' Agreement. (Exhibit C to D.E. 1).

b.  Shortly thereafter, on December 4, 2009, the Government and Votorantim reached an agreement (the "December 4th Agreement") which conditioned Votorantim's duty to pay money and perform on documentary evidence that Sural's interests in the aluminum project had been extinguished. (Award ¶ 131). Presumably Votorantim insisted on these conditions because it previously agreed to buy Sural's interest in the project for $100 million (subject to certain conditions and timelines) and refund Sural's invested capital of $6 million.

c.  The evidence the Tribunal refused to provide access to – and hence evidence the Tribunal refused to hear – would have shown that the Government gave Votorantim the exchange of letters from September and October 2009 between Sural and the Government. The Government did so because it knew that this exchange of letters constituted a binding obligation for the Government to buy Sural's interest in the project. Sural believes the evidence would show that as a result of this review, Votorantim concluded that the condition precedent to it being required to perform under the December 4th Agreement – "documentary evidence, in form and substance satisfactory to Votorantim and GORTT, as to the full termination of Sural's involvement in the Project and in Alutrint" – was satisfied by this exchange of letters.

45.    In fact, during the course of investigating the issues surrounding Votorantim's dealings with the Government, a Votorantim representative told Sural's counsel James D. Wing, in a confidential discussion, that Votorantim paid the Government the $15 million (i.e. money Votorantim was not obligated to pay until it received "documentary evidence, in form and substance satisfactory to Votorantim and GORTT, as to the full termination of Sural's involvement in the Project and in Alutrint"). This discussion further shows that the evidence the Tribunal

denied access to could have been dispositive as to Sural's primary claim that the Government was convinced it was required to buy out Sural.

46.     And the importance of this evidence became even clearer during questioning of Wing by Arbitrator Brower at the final hearing:

>   a.  Arbitrator Brower: The question is for counsel.  I'm looking at E172 [the GORTT/Votorantim December 4, 2009 agreement].  And it refers in paragraph 2 on the first page to the fact, as we've seen from the Votorantim and Trinidad Tobago agreement, that: "The government is required to deliver to Votorantim documentary evidence, in form and substance satisfactory to Votorantim, on the full termination of Sural's involvement in the project," et cetera.  Is there in the record before us, such documentation?
>
>   b.  Mr. Wing:  There is none.
>
>   c.  Mr. Brower: Was it asked for?
>
>   d.  Mr. Wing : We moved the panel on numerous occasions to require the production of the GORTT/Votorantim negotiation and finalization documents, and we were denied. (Exhibit 18).

47.     In the above colloquy, Arbitrator Brower asked whether documents that were shown to Votorantim (to satisfy the requirement that Sural be removed from Alutrint) were in the record.  It is self-evident that the communications between the Government and Votorantim and the testimony of Palmieri were highly relevant to Sural's primary contention that the Government was legally required to buy out Sural.  And there can be no question that evidence that both the Government and Votorantim relied on the September and October 2009 exchange of letters as a binding legal obligation should have been considered by the Tribunal.

## II.     Legal Authorities

48.     A court is limited in its power to overturn an arbitration award.  *See, e.g., Riccard v. Prudential Ins. Co*., 307 F. 3d 1277, 1288 (11th Cir. 2002).  While the Court's decision in *Riccard* involved the Federal Arbitration Act, this principle applies equally to a set aside petition under the Florida International Commercial Arbitration Act ("FICAA"), Florida Statutes § 684.0001 *et seq.* (2015).  To set aside an arbitration award under the FICAA, a party must establish one of the enumerated statutory grounds under Florida Statutes § 684.0048(1).  Two specific

13

statutory grounds exist here, both bearing on the Tribunal's preclusion of Sural from accessing and presenting the critical Votorantim evidence:

    a.  the "party against whom the award is invoked… was … unable to present its case," Fla. Stat. § 684.0048(1)(a)(2) (2015). This ground must be read together with the associated mandatory requirement of Florida Statutes § 684.0029 that "[t]the parties shall be treated with equality, and each party shall be given a full opportunity of presenting its case"; and

    b.  the "arbitral procedure… was not in accordance with the law of the country where the arbitration took place," Fla. Stat. § 684.0048(1)(a)(4). Sural submits that the FICAA's proscription of unequal treatment of the parties was violated when the tribunal gave access to the Government to Sural's communications with Votorantim while denying equal access to Sural.

49.    These specific statutory requirements are neither unusual nor unique. Broadly speaking, participants in U.S. arbitrations are universally entitled to non-discriminatory treatment, a full hearing, and an opportunity to be heard and to present evidence. *See* 21 Williston on Contracts § 57:84 (4th ed.); *see also Totem Marine Tug & Barge, Inc. v. N. Am. Towing, Inc.*, 607 F. 2d 649, 651 (5th Cir. 1979) ("All parties in an arbitration proceeding are entitled to notice and an opportunity to be heard."). Arbitrators must "'give each of the parties to the dispute an adequate opportunity to present its evidence and argument.'" *Tempo Shain Corp. v. Bertek, Inc.*, 120 F. 3d 16, 19 (2d Cir. 1997) (*citing Hoteles Condado Beach v. Union De Tronquistas Local 901*, 763 F. 2d 34, 39 (1st Cir. 1985).

50.    The FICAA phrases its statutory requirements as mandatory principles. Other statutes like the Federal Arbitration Act (9 U.S.C. § 1 et seq.) ("FAA") sometimes phrase a tribunal's refusal to permit a party to put on its case or otherwise violate a party's right to a fair hearing as "arbitral misconduct." In either case, the touchstone for such a finding is the concept of "fundamental fairness". *Compania Chilena De Navegacion Interoceanica, S.A. v. Norton, Lilly & Co., Inc.*, 652 F. Supp. 1512, 1515; *Reichman v. Creative Real Estate Consultants, Inc.*, 476 F. Supp. 1276, 1284–85 (S.D.N.Y. 1979).[8] *See also Bell Aerospace Co. v. Local 516, UAW*, 500 F.

---

[8] As argued above, the New York Convention provides grounds for federal subject matter jurisdiction here, and the Convention makes applicable the Federal Arbitration Act ("FAA") to the extent its terms are not inconsistent with the Convention, *see* 9 U.S.C. § 208, and to the extent that a claim is brought under the Convention. The FAA does not preempt state arbitration laws unless they are fundamentally inconsistent with the FAA. *See, e.g., Volt Information*

2d 921, 923 (2d Cir. 1974). Thus, the "failure of the arbitrators to give notice and an opportunity to be heard is such misconduct or misbehavior as will vitiate an award, irrespective of the fact that there may have been no corrupt intention on the part of the arbitrators." *Cassara v. Wofford*, 55 So. 2d 102, 106 (Fla. 1951).

51.     There is no case law under the FICAA dealing with an arbitrator's refusal to grant one party access to evidence while denying such access to the counter-party. But analogous cases exist under the Federal Arbitration Act ("FAA"). § 10(a)(3) of the FAA embodies the mandate for fundamental fairness. That provision allows a federal court to vacate an arbitration award if "the arbitrators were guilty of misconduct ... in refusing to hear evidence pertinent and material to the controversy[,] or of any other misbehavior by which the rights of the party have been prejudiced." 9 U.S.C. § 10(a)(3). Several decisions have vacated arbitral awards for denying a party the right to assemble and put on evidence important to its case.

52.     The  leading case is the Second Circuit's decision of *Tempo Shain Corporation, et al. v. Bertek, Inc.*, 120 F. 3d 16 (2d Cir. 1997). The case concerned a contract between Bertek, a company that would manufacture and treat materials to enhance their water repellency characteristics, and Tempo Shain, a company that would market and sell the treated products. Disagreements arose and the parties entered arbitration. Each party accused the other of fraudulent inducement. Bertek intended to call Wayne Pollock, a former president of one of its divisions, as a witness to provide testimony concerning negotiations and dealings between the parties relevant to both parties' conflicting claims of fraudulent inducement. Pollock was Bertek's point person in the negotiations and the only witness available to testify on these issues. Pollock's wife became very ill, and Pollock was unable to testify at the time appointed by the arbitrators. Bertek asked to keep the record open until Pollock could testify, but the panel denied the request, determining that Pollock's testimony would be cumulative to other evidence. Bertek lost the arbitration. The district court affirmed the award, but the Second Circuit reversed and vacated it.

53.     The Second Circuit found that the arbitrators' refusal to hear Pollock's testimony resulted in fundamental unfairness and misconduct, stating: "[o]ur review is restricted to determining whether the procedure was fundamentally unfair." (citations omitted). *See also*

---

*Sciences v. Leland Stanford University*, 109 S.Ct. 1248, 1255 (1989). This set aside motion is brought under the FICAA, the law of the arbitral seat; the FICAA's grounds for set aside are not inconsistent with the FAA. For the applicability of state law set aside standards, *see Industrial Risk Insurers v. M.A.N. Gutehoffnungshuette GmbH*, 141 F. 3d 1434 (11th Cir 1998); *Yusuf Ahmed Alghanim & Sons, W.L.L. v Toys "R" Us, Inc.*, 126 F. 3d 15 (2nd Cir 1997).

*Concourse Beauty School, Inc. v. Polakov*, 685 F. Supp. 1311, 1318 (S.D.N.Y. 1988) ("'The misconduct must amount to a denial of fundamental fairness of the arbitration proceeding in order to warrant vacating the award.'") (citations omitted).

54.      While the term "fundamentally unfair" is not specifically stated in the FAA, functionally equivalent language is present in both the FICAA and the UNCITRAL Model Law on International Commercial Arbitration ("Model Law"), as adopted by the United Nations Commission on International Trade Law in 1985.[9]  The concept of fundamental unfairness covers the right for both parties to be treated equally and for each party to be given a full opportunity to present its case.

*55.*      And the Second Circuit was not bound by the arbitrators' determination that the testimony could be ignored because it was "cumulative."  The Court reviewed the record and determined that there was no evidence that the omitted testimony was cumulative.  Here, the Tribunal stated that it was "not satisfied that the evidence would be necessary or material." (Award ¶ 24).  As was explained to the Tribunal and as recounted above, it is clear that evidence surrounding how the Government and Votorantim viewed the September and October 2009 exchange of letters was critical to the arbitrators' assessment of whether a modification to the Shareholders' Agreement was made.  And Palmieri was the only known witness available to Sural able to testify to these facts.  *See, e.g., First Energy (UK) Ltd v Hungarian International Bank Ltd Independent*, 16 April 1993; [1993] 2 Lloyds Rep 194 16 Apr 1993 (letter communicated an unconditional and firm offer, that offer was accepted, and a contract was found to exist as a matter of fact given the commercial context); *RTS Flexible Systems Ltd v Molkerei Alois Müller GmbH & Co KG* (UK Production) [2010] UKSC 14; [2010] 1 W.L.R. 753 (holding generally that whether a contract was formed is a question of fact); *G. Percy Trentham Limited v Archital Luxfer Limited & ors.* [1993] 1 Lloyd's Rep. 25 (accord).

56.      A similar decision was reached in the First Circuit in *Hoteles Condado Beach*. There, a hotel worker was fired for allegedly exposing himself indecently to hotel guest Kimberly Flores.  During the arbitration concerning whether the hotel was permitted to terminate the worker, the hotel called Flores, the only witness, to testify about the incident.  The arbitrator required her husband to leave the hearing room, and she then refused to testify without him present.  Without

---

[9] As stated in the Florida House of Representatives Staff Analysis, the FICAA enacted the Model Law. *See* House of Representatives Staff Analysis, Bill # CS/HB 821, International Commercial Arbitration, April 4, 2010.

her testimony and to overcome the inability of the only witness to testify, the hotel attempted to introduce the transcript from the hotel worker's criminal proceedings regarding the incident. The arbitrator refused to give the transcript any weight because he claimed he could not assess the credibility of the testimony. He then ruled in favor of the fired worker.

57. The district court vacated the award because the arbitrator failed to hear evidence material to the controversy and thereby deprived the hotel of a full and fair hearing. The First Circuit affirmed the *vacatur*, stating that the sequestration of Flores combined with refusing to give weight to the criminal transcript denied the hotel a full and fair hearing. The First Circuit wrote:

> The [district] court noted the deference accorded an arbitrator's conduct of arbitral proceedings and the limited role of the courts in reviewing arbitral awards. The court determined, however, that the arbitrator in the instant case neglected his duty to afford each of the parties sufficient latitude to present evidence central to the dispute and so prejudiced the Company's right to a full and fair hearing as to require that the award be vacated.

*Id*. at 39. As in *Hoteles Condado Beach*, the evidence Sural sought was "central to the dispute…" *Id*. Sural was denied access to written evidence in the Government's possession and then prohibited from adducing testimony from the only witness available on the key issue (i.e. whether Votorantim paid $15 million in reliance on a binding agreement between Sural and the Government that the Government likely acknowledged to Votorantim).

58. In another important New York case, *Home Indem. Co. v. Affiliated Food Distributors, Inc.*, 1997 WL 773712 (S.D.N.Y. 1997), the district court overturned a final award an arbitrator entered after prohibiting the losing party from accessing material written evidence in the prevailing party's possession. A workers' compensation insurer, Home Indemnity ("Home"), had entered into an agreement with its insured, Affiliated Food Distributors ("Affiliated"), as part of a worker's compensation and employer's liability policy issued by Home. This "Deductible Agreement" imposed on Affiliated a $500,000 deductible on each claim filed, required Affiliated to make monthly payments of Home's invoices for claims paid, and required Affiliated to post a $600,000 irrevocable letter of credit in a favor of Home, with Home having what the court characterized as "uninhibited" draw down rights. *Id*. at *1. Home became aware during an audit that Affiliated was contemplating dissolution. Nevertheless, it voluntarily reduced its letter of credit security to $200,000. Thereafter, Affiliated and its parent company disputed Home's

handling of claims and resultant billings and refused to pay $673,000 billed by Home.  Home drew down the remaining $200,000 on the letter of credit and refused Affiliated's request for access to disputed claims files unless it had appropriate assurances that it would be paid the amount it claimed was due.  An arbitration followed.

59.     During the arbitration, Home refused to provide its claims files relating to the disputed billings without Affiliated posting a new letter of credit or giving other security for the $473,000 that remained due.  The arbitrator ruled for Home, and entered an interim award ordering Affiliated to post additional security.   The arbitrator conditioned Affiliated's access to the claims files on Affiliated posting the security without making any review of the underlying merits. Affiliated did not post the security and the arbitrator ruled for Home without giving Affiliated access "to the very claims files that would clarify whether there was any meritorious basis for the security…." *Id*. at *3.

60.     The district court vacated the award.  It found that Affiliated had not been afforded a "fundamentally  fair hearing" because the awarded security was "directly linked to the preclusion of Affiliated's discovery," *Id*. at *4, and that Affiliated had been denied access to the "the very claims files that would clarify whether there was any meritorious basis for the security…."  *Id*. at *3.

61.     The decision dealt not with the exclusion of a critical witness, but to a party's right to discover material documents in the possession of its adversary.  It focused on the principle that a party to an arbitration has the right to present its full case, and that the arbitral process, while not guaranteeing full discovery, must nevertheless grant access to documents to avoid violating the fundamental fairness guarantee of the arbitration process.   The district court addressed this proposition:

> The absence of statutory provision for discovery techniques in arbitration proceedings obviously does not negate the affirmative duty of arbitrators to insure that relevant documentary evidence in the hands of one party is fully and timely made available to the other party.... [A] failure to discharge this simple duty would constitute a violation of [FAA § 10(a)(3)], where a party can show prejudice as a result.  *Chevron Transport Corporation v. Astro Vencedor Compania Naviera, S.A.*, 300 F. Supp. 179, 181 (S.D.N.Y. 1969).

*Home Indem. Co.,* 1997 WL 773712 at *4.  *See also LJL 33rd Street Associates, LLC v. Pitcairn Properties Inc.*, 725 F.3d 184, 193-95 (2nd Cir. 2013) (affirming the decisions in *Tempo Shain*

and *Hoteles Condado Beach*, but distinguishing those cases because the evidence not considered by the arbitrator was hearsay, a defect which the proponent of the evidence could have cured).

62.     The above cases are only a sampling of cases where arbitration awards have been set aside because a party has been denied the right to put on its case.  Plenty of other decisions exist.  *See, e.g., Harvey Aluminum Inc. v. United Steelworkers of America, AFL-CIO*, 263 F. Supp. 488 (C.D. Cal. 1967) (district court vacated arbitral award after arbitrator disregarded the testimony of a witness because testimony was not proper rebuttal testimony and should have been offered in case-in-chief); *Watkins-Johnson Co. v. Public Utilities Auditors*, 1996 WL 83883, at *3-*4 (N.D. Cal. 1996) (district court vacated arbitral award because the cross examination was not permitted for a person who had not been called on direct but had submitted a written statement); *Gulf Coast Indus. Workers Union v. Exxon Co., USA*, 70 F.3d 847 (5th Cir. 1995) (district court vacated arbitral award and Fifth Circuit affirmed where company attempted to enter evidence supporting its case, the arbitrator ruled that the evidence did not need to be established as a business record, and then the arbitrator later ruled that the evidence was insufficient because it was not established as a business record).

63.     As in the cases cited above, the Tribunal's actions materially affected the Award. The refusal to allow Sural access to key documents and testimony significantly impacted the merits concerning the binding nature of the Government's agreement to buy Sural's interest and left Sural unable to present its case.

## REQUEST FOR ORAL ARGUMENT

64.     Because of the important issues presented herein, Sural respectfully requests that the Court schedule oral argument on these issues.

## CONCLUSION

For the foregoing reasons, Petitioner Sural (Barbados) Ltd. respectfully moves this Court to Set Aside, in Part, the Arbitration Award served on June 12, 2015, and for such other and further relief as the Court deems appropriate.

Dated: August 20, 2015                    Respectfully submitted,

                                          HOLLAND & KNIGHT LLP


                                          By: /s/ James D. Wing
                                              James D. Wing
                                              Florida Bar No. 195537
                                              james.wing@hklaw.com
                                              Michael E. Hantman
                                              Florida Bar No. 0502790
                                              michael.hantman@hklaw.com
                                              701 Brickell Avenue, Suite 3300
                                              Miami, FL  33131
                                              Telephone: (305) 374-8500
                                              Facsimile:  (305) 789-7799

                                              *Attorneys for Petitioner Sural (Barbados) Ltd.*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on this 20th day of August, 2015, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system and furnished a copy by electronic mail to: Angelika Hunnefeld, Esq., hunnefelda@gtlaw.com, *Counsel for Respondent*, Greenberg Traurig LLP, 333 SE 2nd Avenue, Suite 4400, Miami, Florida 33131.


                                          By: /s/ James D. Wing
                                              James D. Wing