UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 1:15-cv-22825-KMM

SURAL (BARBADOS) LTD.,

    Petitioner,

v.

THE GOVERNMENT OF THE REPUBLIC
OF TRINIDAD AND TOBAGO THROUGH
ITS MINISTER OF FINANCE AS
CORPORATION SOLE.

    Respondent.
_____/

## **ORDER**

THIS CAUSE came before the Court upon Petitioner Sural (Barbados) Ltd.'s ("Sural") Petition to Set Aside, in Part, and Confirm, in Part, the Arbitration Award against Respondent, the Government of The Republic of Trinidad and Tobago ("GORTT"). *See* (ECF No. 1). Sural also filed a Motion to Confirm, in Part, the Arbitration Award (ECF No. 5), and a Corrected Motion to Set Aside, in Part, the Arbitration Award (ECF No. 7). GORTT filed its Answer and Affirmative Defenses to the initial Petition (ECF No. 9) as well as corresponding responses to each of Sural's Motions. *See* (ECF Nos. 10, 11). GORTT's latter response included a Cross-Motion to Confirm the Arbitration Award. (ECF No. 11). Subsequently, Sural filed its Answer and Affirmative Defenses to GORTT's Cross-Motion (ECF No. 14) and replies to each of GORTT's Responses. *See* (ECF Nos. 15, 16). GORTT then filed a Reply in further support of its Cross-Motion (ECF No. 19), to which Sural was granted leave to file a Sur-Reply (ECF No. 22). After several stays of the proceedings to facilitate settlement discussions, Sural's Sur-Reply was submitted to the Court on April 1, 2016. For the reasons set forth below, GORTT's Cross-

Motion is GRANTED, Sural's Motions are DENIED, and the arbitration award is confirmed in its entirety.

I. BACKGROUND[1]

GORTT, through its Minister of Finance ("MOF"), and Sural, through Dr. Alfredo Riviere ("Riviere"), Sural's President and CEO, began discussions regarding the creation of an aluminum smelter and associated downstream plants (the "Project") as early as 2001. Award ¶ 54 (ECF No. 1-2). Negotiations were ongoing, and in 2005, Sural began discussions for financing and constructing the smelter with representatives of a Chinese entity ("CMEC"). *Id*. at ¶ 61. Sural, GORTT, and CMEC executed a memorandum of understanding regarding the Project on March 23, 2005. *Id*. at ¶ 62. On April 8, 2005, the parties incorporated Alutrint as the corporate vehicle that would be responsible for the Project. *Id*. at ¶¶ 68–69. Thereafter, the parties executed a letter agreement concerning Alutrint on May 18, 2005 (the "Letter Agreement"). *Id*. at ¶ 70.

After various delays surrounding the Project, Sural and GORTT executed the Unanimous Shareholders Agreement ("USA") on July 3, 2007. *Id*. at ¶ 164. Clause 5.4 of the USA provided that equity contributions to Alutrint would be made by GORTT at 60% and Sural at 40%. *Id*. at ¶ 160. Pursuant to the USA, Alutrint made an equity call for the $20 million CMEC requested as an additional mobilization fee (the "Equity Call"). *Id*. at ¶¶ 87, 89. On July 30, 2007, GORTT paid its share of the Equity Call—$12 million. *Id.* at ¶ 90. Although Sural repeatedly promised to pay the $8 million it owed towards the Equity Call under the USA, it never remitted the payment. *Id.* at ¶¶ 91–92. On December 10, 2007, GORTT provided Sural with notice of

---

[1] As the Court is writing primarily for the parties' benefit, it assumes the parties' familiarity with the underlying facts and thus will only set forth those facts that are pertinent to resolving the various motions before the Court under the applicable legal framework.

2

material breach for failure to pay Sural's share of the Equity Call. *Id.* at ¶ 94. Shortly thereafter, Sural began negotiations with a Brazilian industrial conglomerate, the Votorantim Group ("VG"), for a restructured project. *Id.* at ¶ 106. After various discussions among the parties, VG and Sural presented joint proposals to GORTT for a restructured project. *Id.* at ¶¶ 108–13.

On December 4, 2009, GORTT and VG entered into an agreement regarding VG's participation in a restructured version of the Project—one which was double the capacity envisaged in the USA, conditioned on termination of both Sural's equity participation in Alutrint and the USA. *Id*. at ¶¶ 128–29, ¶ 263. On March 4, 2010, GORTT internally agreed to terminate the USA and appointed a team to negotiate the price of Sural's interest in Alutrint. *Id*. at ¶ 132. GORTT and Sural attempted to negotiate the buyout but could not agree on valuation. *Id*. at ¶¶ 133–34. While negotiations were ongoing, GORTT experienced a change in leadership after the country's May 24, 2010 general election. The new government of Trinidad and Tobago ultimately decided not to proceed with the Project. *Id*. at ¶¶ 135–37.

On July 2, 2012, Sural filed a request for arbitration before the International Court of Arbitration of the International Chamber of Commerce ("ICC") in order to resolve the contractual issues between GORTT and Sural that arose from the failed development of the Project. Specifically, Sural alleged two claims against GORTT: (1) Sural claimed that in October 2009, GORTT "agreed to vary the terms" of the USA to buy out Sural's interest in Alutrint, as evidenced by the September 9, 2009, and October 2, 2009 GORTT/Sural Letter Exchange ("Fall 2009 Letter Exchange"); and (2) Sural claimed that GORTT wrongfully repudiated the USA when it renounced the Project in September 2010. *Id*. at ¶ 207. Pursuant to the USA, these claims were governed by the laws of Trinidad and Tobago, which was treated as following and applying English law. *Id*. at ¶ 30.1.

3

After an extensive discovery process, the parties proceeded to a final arbitration hearing, which was held before a three-member arbitral panel (the "Tribunal") on September 8–10, 2014 in Miami, Florida.[2] On June 12, 2015, the Tribunal issued a final arbitration award (the "Award") that rejected Sural's arguments and dismissed its claims. On July 3, 2015, GORTT filed an application to confirm the Award in the High Court of Justice, Queen's Bench Division (the "High Court") in England, pursuant to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "New York Convention"). On July 14, 2015, the High Court entered an order confirming the Award. Sural was served with the confirmation order on July 23, 2015, and proceeded to initiate this action on July 29, 2015. With this framework in mind, the Court now turns to the merits of the parties' motions.

## II.    APPLICABLE LAW

The Supreme Court has recognized an "emphatic federal policy in favor of arbitral dispute resolution." *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 631 (1985); *see also Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 217 (1985) (noting that where parties have seen fit to adopt arbitration clauses in their agreements, there is a "strong federal policy in favor of enforcing [them]"). Since the United States' accession to the New York Convention in 1970 "and the implementation of the Convention in the same year by amendment of the Federal Arbitration Act, that federal policy applies with special force in the field of international commerce." *Mitsubishi Motors*, 473 U.S. at 631; *see also Smith/Enron Cogeneration Ltd. P'ship, Inc. v. Smith Cogeneration Int'l, Inc.*, 198 F.3d 88, 92 (2d Cir. 1999)

---

[2] As the arbitration proceedings here were between parties domiciled or having their principal place of business outside of the United States, the Award entered in this matter is considered "non-domestic" for purposes of the New York Convention. *See e.g. Yusuf Ahmed Alghanim & Sons v. Toys "R" Us, Inc.*, 126 F.3d 15, 19 (2d Cir. 1997).

("The adoption of the Convention by the United States promotes the strong federal policy favoring arbitration of disputes, particularly in the international context.").

The Convention's goal, "and the principal purpose underlying American adoption and implementation of it, was to encourage the recognition and enforcement of commercial arbitration agreements in international contracts and to unify the standards by which agreements to arbitrate are observed and arbitral awards are enforced in the signatory countries." *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 520 n.15 (1974). To facilitate this goal, "[t]he New York Convention provides a carefully structured framework for the review and enforcement of international arbitral awards." *Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 364 F.3d 274, 287 (5th Cir. 2004).

Chapter 2 of the Federal Arbitration Act ("FAA") ratifies and incorporates the New York Convention. *See* 9 U.S.C. §§ 201–208; *see also Czarina, L.L.C. v. W.F. Poe Syndicate*, 358 F.3d 1286, 1290 (11th Cir. 2004). "When reviewing an arbitration award, 'confirmation under the Convention is a summary proceeding in nature, which is not intended to involve complex factual determinations, other than a determination of the limited statutory conditions for confirmations or grounds for refusal to confirm.'" *Chelsea Football Club Ltd. v. Mutu*, 849 F. Supp. 2d 1341, 1344 (S.D. Fla. 2012) (quoting *Zeiler v. Deitsch*, 500 F.3d 157, 169 (2d Cir. 2007)). Thus, a district court must confirm an arbitration award under the Convention, unless one of the seven enumerated defenses in Article V apply. *Indus. Risk Insurers v. M.A.N. Gutehoffnungshutte GmbH*, 141 F.3d 1434, 1441 (11th Cir. 1998); *see also* 9 U.S.C. § 207. "[T]he party seeking to avoid summary confirmance of an arbitral award has the heavy burden of proving that one of the seven defenses applies." *VRG Linhas Aereas S.A. v. MatlinPatterson Glob. Opportunities Partners II L.P.*, 717 F.3d 322, 325 (2d Cir. 2013) (citation omitted).

## III. DISCUSSION

Despite the bevy of motions before the Court regarding the Award, the parties' arguments are relatively straightforward. The gist of Sural's arguments is that certain discovery decisions the Tribunal made prior to the hearing prevented it from presenting its case and ultimately deprived Sural of a fundamentally fair hearing which now warrants the vacatur, or partial confirmation, of the award. GORTT, on the other hand, asserts that Sural has failed to meet the high burden required to overturn an award subject to the New York Convention given the summary nature of this Court's review. Alternatively, GORTT suggests that the Court may defer to the ruling by the High Court confirming the Award, which pre-dates this cause of action.[3] Recognizing the limited review available to the Court under the Convention, the Court finds Sural has not met its high burden to establish that the Award should be vacated.

---

[3] Under the New York Convention, England is a "secondary jurisdiction" and the United States is a "primary jurisdiction." *Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 335 F.3d 357, 368 (5th Cir. 2003). In dicta, the Eleventh Circuit has noted that "several commentators have opined that a court of primary jurisdiction would have the power under the Convention's scheme to vacate an arbitration award notwithstanding the fact that it had previously been enforced by a court of secondary jurisdiction." *Ingaseosas Int'l Co. v. Aconcagua Investing Ltd.,* 479 F. App'x 955, 962 (11th Cir. 2012). "[A]lthough the Convention permits a primary jurisdiction court to apply its full range of domestic law to set aside or modify an arbitral award, secondary jurisdiction courts may only refuse or stay enforcement of an award on the limited grounds specified in Articles V and VI." *Gulf Petro Trading Co., Inc. v. Nigerian Nat. Petroleum Corp.*, 512 F.3d 742, 747 (5th Cir. 2008). Put another way, as the powers of the two adjudicative bodies vary greatly under the Convention, and Sural challenges the jurisdiction of the High Court to enforce the Award, principles of judicial comity are not offended when this Court considers whether to vacate or enforce the Award.

1.  The New York Convention Mandates Confirmation of the Award

The parties do not dispute that the Award is subject to the New York Convention.[4] In resisting confirmation of the Award, Sural relies on Article V(1)(b) of the Convention and the grounds for vacatur under the Florida International Commercial Arbitration Act ("FICAA") to argue that it was denied an opportunity to present its case based on certain evidentiary rulings of the Tribunal. Specifically, Sural now challenges the Tribunal's pre-hearing refusal to issue a subpoena for the testimony of Marco Palmieri, an executive for third-party VG, and the Tribunal's denial of a request for disclosure of correspondence between GORTT and VG from June 2008 through 2009.

As to the denial of the subpoena, the Tribunal rejected Sural's application as untimely and found that the "taking of the evidence may be disruptive of the course of the arbitration and unfair to the respondent" and "the tribunal [wa]s not satisfied that the evidence would be necessary or material." *See* Award ¶ 24 (ECF No. 1-2). On July 23, 2014 the Tribunal denied Sural's motion to compel as untimely and further found the request to be cumulative and lacking relevancy. *See* Pet'r's Ex. 16 (ECF No. 7-1).

---

[4] Sural asserts that the FAA has no application to the Petition/Application to set aside or confirm the Award. *See* (ECF No. 1) at 1–2. Additionally, in both Petitioner's Motion to Confirm in Part (ECF No. 5) and Petitioner's Motion to Set Aside in Part (ECF No. 7), Sural relies solely upon FICAA's statutory grounds for vacatur/partial confirmation of the Award. *See* Fla. Stat. §§ 684.0001 *et seq.* (2011). However, as GORTT correctly points out, FICAA "effectively mirrors the limited grounds to refuse enforcement in the New York Convention." Resp.'s Cross-Motion (ECF No. 11) at 9 n.6. As the FAA implements the New York Convention, Sural's initial contention is a fundamental misstatement of the law. Certainly, the FAA and New York Convention provide "overlapping coverage" to the extent they do not conflict, but given the limited review under the New York Convention, the Court need not graft onto its analysis any of the enumerated defenses present in the FAA. *See Encyclopaedia Universalis S.A. v. Encyclopaedia Britannica, Inc.*, 403 F.3d 85, 92 (2d Cir. 2005). As to FICAA, it is best construed as a gap filler to the Convention for a federal court sitting in a primary jurisdiction.

Both of these rulings occurred months before the actual arbitration hearing before the Tribunal. Despite its due process concerns, Sural proceeded to (1) participate fully in a three-day arbitration hearing under the auspices of the ICC; (2) conduct extensive pre-hearing and post-hearing briefings; (3) and even sought to confirm in part portions of the Award it found favorable. Sural's efforts to vacate the Award are merely an attempt to mask its unsuccessful arbitration campaign under the guise of a lack of due process. The fact that Sural never objected to—or contested—the Tribunal's rulings is glaringly indicative of Sural's waiver of these arguments through acquiescence. *See AO Techsnabexport v. Globe Nuclear Servs. & Supply GNSS, Ltd.*, 404 F. App'x 793, 798 (4th Cir. 2010) (holding that arguments raised for the first time in district court are deemed waived); *Brook v. Peak Int'l, Ltd.*, 294 F.3d 668, 674 (5th Cir. 2002); *United Steelworkers of Am., AFL-CIO-CLC v. Smoke-Craft, Inc.*, 652 F.2d 1356, 1360 (9th Cir. 1981) ("Parties to arbitration proceedings cannot sit idle while an arbitration decision is rendered and then, if the decision is adverse, seek to attack the award collaterally on grounds not raised before the arbitrator.").

This point is further reinforced by Article 39 of the ICC Rules—the governing rules of the subject arbitration—entitled "Waiver," which provides that

> A party which proceeds with the arbitration without raising its objection to a failure to comply with any provision of the Rules, or of any other rules applicable to the proceedings, any direction given by the arbitral tribunal, or any requirement under the arbitration agreement relating to the constitution of the arbitral tribunal or the conduct of the proceedings, shall be deemed to have waived its right to object.

ICC Rules of Arbitration[5], Art. 39 (2012). Further, Sural appears to overlook the fact that FICAA has an express waiver provision that cuts against its arguments for vacatur. *See* Fla. Stat. § 684.0006 ("A party waives its right to object if the party proceeds with the arbitration and fails to object without undue delay or within a provided time limit.").

Given the high threshold required to overturn an arbitration award under the Convention—and this Court's necessarily limited review—the Court finds that Sural's arguments for vacating the Award must fail as a matter of law. Even if Sural's arguments on these issues were not waived, the Court still finds Sural's challenges to the Tribunal's discovery decisions woefully deficient. After all, "[t]here is a reason why federal courts grant substantial deference to the evidentiary findings of arbitral tribunals: these bodies have greater resources, expertise, and access to evidence in order to develop factual findings, and federal courts are poorly situated to second-guess their conclusions." *Gold Reserve Inc. v. Bolivarian Republic of Venezuela*, 146 F. Supp. 3d 112, 130 (D.D.C. 2015). To have courts meddle in disputes of this nature would not only obviate the deference courts owe to arbitral tribunals, it also would drastically "undermin[e] the twin goals of arbitration, namely, settling disputes efficiently and avoiding long and expensive litigation." *Folkways Music Publishers, Inc. v. Weiss*, 989 F.2d 108, 111 (2d Cir. 1993). The Court cannot countenance such a course of action.

## IV. CONCLUSION

> The Convention, and American enforcement of it through the FAA, provide[ ] businesses with a widely used system through which to obtain domestic enforcement of international commercial arbitration awards resolving contract and other transactional disputes, subject only to *minimal standards of domestic judicial review* for basic fairness and consistency with national public policy.

---

[5] The ICC Rules can be found at *ICC Rules of Arbitration*, INT'L CHAMBER OF COMMERCE, http://www.iccwbo.org/products-and-services/arbitration-and-adr/arbitration/icc-rules-of-arbitration/ (last visited Aug. 11, 2016).

*Indus. Risk Insurers*, 141 F.3d at 1440 (emphasis added) (quoting G. Richard Shell, *Trade Legalism and International Relations Theory: An Analysis of the World Trade Organization*, 44 Duke L.J. 829, 888 (1995). As the Supreme Court recently noted, "[i]n bilateral arbitration, parties forgo the procedural rigor and appellate review of the courts in order to realize the benefits of private dispute resolution: lower costs, greater efficiency and speed, and the ability to choose expert adjudicators to resolve specialized disputes." *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 685 (2010). These benefits are eviscerated "[i]f we permit parties who lose in arbitration to freely litigate their cases in court." *B.L. Harbert Int'l, LLC v. Hercules Steel Co.*, 441 F.3d 904, 907 (11th Cir. 2006) (abrogated on other grounds). Quite simply, Sural's arguments for vacating the Award are predicated more on its "buyer's remorse" over the outcome rather than a violation of Sural's due process rights during the arbitration process.

Accordingly, it is hereby ORDERED and ADJUDGED that GORTT's Cross-Motion to Confirm the Award (ECF No. 11) is GRANTED. The Arbitration Award (ECF No. 1-2) is CONFIRMED. It is further ORDERED and ADJUDGED that Sural's Motions (ECF Nos. 5, 7) are DENIED. The Clerk of Court is directed to CLOSE this case. All other pending motions, if any, are DENIED as MOOT.

DONE AND ORDERED in Chambers at Miami, Florida, this 12th day of August, 2016.

K. MICHAEL MOORE
CHIEF UNITED STATES DISTRICT JUDGE

c: All counsel of record